(150 App. Div. 361.)

### BARNEY et al. v. HOYT et al.

(Supreme Court, Appellate Division, First Department. May 3, 1912.)

1. LIMITATION OF ACTIONS (§ 103*)—COMPUTATION OF PERIOD—ACCRUAL OF RIGHT—ACTION AGAINST TRUSTEE.

Certain property was purchased for the joint account of two persons and title taken in the name of the one who advanced the money under an agreement that the other party would pay his share of the purchase price in three years. After the expiration of three years and until the death of the person making the advancement, there was no repudiation of the liability nor a request for performance. After the death of the trustee, the existence of the trust was not questioned by his heirs and executors until about two years before the bringing of a suit for an ac-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

counting. *Held*, that the statute of limitations could not be interposed to the claim for accounting.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 500, 506–510; Dec. Dig. § 103.*]

2. TRUSTS (§ 365*)—RIGHTS OF CESTUI QUE TRUST—LACHES.

An action for an accounting on land purchased for the joint account of the plaintiffs' testator and the testator of defendants is not barred by laches where the existence of the trust was recognized by the making of semiannual and annual statements by the trustee and after his death by his heirs and executors until within two years of the bringing of the action.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 568–573; Dec. Dig. § 365.*]

3. STIPULATIONS (§ 14*)—CONSTRUCTION AND OPERATION—STIPULATION AS TO JUDGMENT ON REVIEW.

Though, on the trial of an action for an accounting, a stipulation was entered fixing the amount of recovery to which the plaintiffs would be entitled in the event of a recovery, where it does not clearly confer power on the court on appeal to grant final judgment, it may not enter such judgment on a reversal.

[Ed. Note.—For other cases, see Stipulations, Cent. Dig. §§ 24–37; Dec. Dig. § 14.*]

Appeal from Special Term, New York County.

Bill by Ashbel H. Barney and others against Henry R. Hoyt and others. From a judgment dismissing the complaint, plaintiffs appeal. Reversed conditionally.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Morgan J. O'Brien, of New York City, for appellants.

Julius M. Mayer, of New York City (Charles K. Carpenter, of New York City, on the brief), for respondents.

LAUGHLIN, J.   This is a suit in equity for an accounting upon the theory that the block of land bounded by Eighty-Seventh street, Amsterdam avenue, Eighty-Sixth street, and Broadway, the record title to which was in Alfred M. Hoyt at the time of his death on the 18th day of June, 1903, was purchased and held for the joint account of said Hoyt and the plaintiffs' testator Charles T. Barney, who died November 14, 1907.

Hoyt was a man of means, and he invested large amounts of money in real estate. Barney was a successful real estate operator. They never were partners in business, but shortly after the purchase in question, and possibly prior thereto, although this is not clearly shown by the record, they became jointly interested in many real estate investments. On the 3d day of October, 1890, by direction of Barney, one Baker, who was in his employ, entered into a contract with Frederick Haberman for the purchase of the premises in question for the consideration of $300,000. Barney advanced $5,000 for the down payment, and thereupon wrote Hoyt with respect thereto as follows:

"The purchase of the block was made, the contract signed by Mr. Baker and turned over to Daly, Hoyt & Mason for examination of the title. Will·

you kindly send me check for five thousand ($5000.00) dollars, paid on the contract? Balance will be payable on March 15th."

Hoyt replied to this letter next day as follows:

"Your favor 5 just received. We inclose you check for five thousand dollars—being amt paid by you on a/c purchase lots 86 & 87 St. on joint a/c. Note balance payable 15 inst."

A question then arose with respect to the marketability of the title to the northerly half of the block, and on the 29th day of April, 1890, Baker took title to the southerly half, and paid therefor the sum of $165,000, furnished by Hoyt, and on the same day he entered into a contract with Haberman, whereby he agreed to take title to the northerly half of the block and pay the remaining $135,000, provided the Court of Appeals should decide that the title was good. On the 7th day of May thereafter Baker conveyed the southerly half to Hoyt; and the next day Hoyt and Barney executed an agreement in writing under seal, reciting the making of the contract by Baker for the purchase of the premises, the conveyance of the southerly half to Baker pursuant thereto, and the agreement with respect to purchasing the northerly half, and that Hoyt had "advanced" the money to enable Baker to carry out the contract, and had received a deed to the southerly half, and agreeing to and with each other as follows:

"First. The said Alfred M. Hoyt hereby agrees that he will furnish the necessary money to carry the said property for the space of three years from the date hereof, and will also furnish the said Baker with sufficient money to enable him to complete his purchase of the north half of the block when the same shall be conveyed to him; and that he will carry the said property for the joint account of himself and the said Charles T. Barney.

"Second. The said Charles T. Barney agrees that at the end of three years, or sooner if the parties shall so agree, to pay to the said Alfred M. Hoyt one-half of the total cost of purchasing and carrying said block of ground, and that until such time he shall so pay the said one-half cost, that the title of the said block of ground shall remain in the said Alfred M. Hoyt.

"If the parties hereto, before the expiration of the term of three years, shall mutually desire to sell any or all of said property, the said Alfred M. Hoyt hereby agrees to execute a deed or deeds for the conveyance hereof.

"It is understood and agreed that this agreement shall be binding upon the heirs, executors and administrators of the parties hereto."

The Court of Appeals decided that the title to the northerly half of the block was marketable, and it was conveyed to Baker by Haberman on the 9th day of October, 1891. Hoyt, pursuant to his agreement with Barney, furnished the remaining $135,000 of the purchase price. On the 19th day of October, 1891, Baker conveyed the title so acquired to Hoyt. On the 30th day of March, 1892, Hoyt conveyed the entire block to Baker, who on the 20th day of April thereafter executed a mortgage thereon for $100,000, and on the 8th day of June, 1892, reconveyed the premises to Hoyt, and the record title then remained in Hoyt until his death as aforesaid. The carrying charges, over and above the small income derived from the property, which was virtually unimproved, were paid by Hoyt; but Barney at times advanced them, and was reimbursed therefor by Hoyt. From the time of the purchase until 1897 semiannual statements with

respect to the carrying charges of the property were transmitted by Hoyt to Barney, and from 1897 until Hoyt's death they were sent annually. The three years specified in the agreement herein quoted expired May 8, 1893. Two days thereafter Hoyt wrote Barney as follows:

"Inclosed please find acct current & Int. acct on our joint acct Real Estate brought down to 1 May. Please examine & advise if not correct."

Hoyt did not stand upon his right to be reimbursed at that time. Plaintiffs introduced in evidence a letter dated September 4, 1894, received by Hoyt inquiring whether this property was for sale and the price. Hoyt transmitted this letter to Barney with the following indorsement: "Respectfully referred to Mr. C. T. Barney." On the 12th day of November, 1895, Hoyt wrote Barney concerning an offer for the property, which Hoyt described in the letter as "our block," and stated that he had declined the offer, and that the broker would probably pay more if he thought a trade could be made, and closed by saying:

"He is anxious to have us offer them, I don't care about giving him a price, do you?"

March 31, 1897, Hoyt wrote Barney as follows:

"Referring to the matter of interest in the accounts of the 86th and 87th St. property, I find in computing the interest at 5% instead of 6% up to November, 1896, a difference of $14,101.96. I have credited the account this amount. Hereafter the rate of interest will be 5% (after the 1st November, 1896), and accounts will be made out yearly instead of semiannually."

On June 15, 1897, Hoyt wrote Barney, advising him with respect to leasing the property, and closed by saying:

"I would be willing to take $34,000.00 per year for the 11 year term if cant do better. The more I think over this matter, the more I am convinced it will be far better for us, as we are arranging this as an investment for our children, to clear this property of all encumbrances so as to have the income free and clear. As I leave town Wednesday afternoon, I regret that I will not be able to see you and learn your views of the matter."

June 19, 1897, Hoyt wrote Barney, acknowledging the receipt of a letter, and saying:

"As I shall be in town next Tuesday & Wednesday I hope to meet you & talk over the matter of our 86th St. property. Better this way than to write."

After Hoyt's death, his executors transmitted annual statements to Barney with respect to this property as before until 1906. These statements were prepared and sent by the defendant Jackson, who was a partner and one of the executors of Hoyt or by his direction; but the evidence shows that it was without the knowledge of the other executors or of Hoyt's devisees. The property was managed by Barney while Hoyt lived, but Hoyt from time to time advised with him with respect thereto. After Hoyt's death, Barney continued to collect the rents and to manage the property with the advice of Hoyt's executors, and participated in the management of the property with them until about the month of June, 1907, when, at the request of one of the executors, who was also Hoyt's son, he turned

135 N.Y.S.—9

over all papers relating thereto, and thereafter it was exclusively managed by Hoyt's executors. On the appraisal of Hoyt's estate for the purpose of imposing the transfer tax, Hoyt's devisees by an affidavit filed August 30, 1904, claimed title in him exclusively, and paid the transfer tax on that basis, and made no claim for reimbursement for any part thereof against Barney or his estate; but it does not appear that Barney ever became aware of the fact that the entire title was thus claimed by the devisees of Hoyt. After the death of Hoyt, and during the lifetime of Barney, it does not appear whether any question with respect to Barney being interested in the premises arose between him and the representatives of Hoyt's estate. There is no evidence that he expressly asserted such an interest; but there appears to have been no occasion therefor. Barney was largely indebted to Hoyt for moneys borrowed, and his notes therefor were outstanding at the time of his death in amounts aggregating about $200,000. He was unable to meet his obligations, and at no time appears to have been able to tender Hoyt or Hoyt's executors, devisees, or heirs his share of the purchase price and carrying charges of the premises to entitle him to a conveyance of an undivided one-half thereof. The first time the question appears to have arisen between the parties as to whether Barney's estate had an interest in the premises was in the month of October, 1907, when in the schedules of the assets of the Barney estate prepared with a view to effecting an extension with his creditors their premises were scheduled as an asset of the value of $100,000. Hoyt's successors in interest at once denied that the Barney estate had any interest in the premises. No express assertion of the claim appears to have been made thereafter until February 16, 1909, when a formal demand was made for an accounting, prior to the commencement of this action. The failure of Barney, or of his estate, to assert an interest in the premises, is explainable upon the theory that there appears to have been no occasion for asserting an interest until such time as he or his successors in interest would be able to make the proper tender and demand a conveyance. There was, however, no admission by Barney or by the representatives of his estate that he had no interest in the premises. There was, therefore, no abandonment by Barney or his successors of his or their rights in the premises. With the exception of transmitting the annual reports, to which reference has been made, and allowing Barney to manage or participate in the management of the estate for a time, it appears that the executors of Hoyt managed and dealt with the premises in question as if Hoyt, at the time of his death, had been the exclusive owner thereof; and the premises were subsequently conveyed on that theory and they have been extensively improved by the grantee, who is not a party to the suit. On the 20th day of June, 1901, Hoyt and Barney made an agreement in writing reciting that they had at various times purchased real estate for their joint account, that the purchases were set forth at length and fully described in Barney's books, that Barney agreed to superintend and manage the property, consisting of a number of specified parcels, title to which, it was expressly re-

cited, might then be in the name of -Baker or another, and providing that the expenses should be borne equally, and fixing the compensation which Barney should receive for his services. With respect to the premises in question that agreement contained a provision as follows:

"The Haberman purchase, 86th and 87th streets and Broadway, are not covered by this agreement."

The learned counsel for each party contends that the exception of the premises in question from this agreement is an argument in favor of his theory of the case. It appears that each party had advanced his proportionate share in the investments to which that agreement relates. That in and of itself distinguishes those holdings from the one in question now. If, as contended in behalf of respondents, Barney had no interest in the premises in question when that agreement was made, it is quite improbable that the agreement would have contained a reference to them, and, if it did, since its purpose was to have a record made of the rights of the parties with respect to their real estate, it is highly probable that it would have stated therein that Barney had abandoned his rights, if any, and no longer was interested therein. The exception of the premises in question from that agreement, therefore, tends to show that the rights of the parties with respect thereto were deemed prescribed, or were to be prescribed, in another agreement, and they were fully defined by the agreement of May 8, 1890.

[1] There are other items of evidence from which claims are made by counsel for the respective parties, but this is the substance of the uncontroverted and controlling evidence bearing upon the questions at issue. We are of opinion that it is fairly to be inferred therefrom that the property was originally purchased for the joint account of Barney and Hoyt, and title was taken in Hoyt as security for the moneys advanced, and that, at the expiration of the three years specified in the agreement within which time Barney was to reimburse Hoyt, Hoyt still recognized Barney's interest, and did nothing thereafter to put him in default, or to terminate his rights, but continued until his death to lead Barney to believe that his rights remained the same as they were at the outset. Of course, Hoyt was under no obligation to carry the property indefinitely for their joint account. He was at liberty to sell it if Barney refused or failed after reasonable notice to reimburse him for the amount advanced, or he could continue to carry it, as he did, on their joint account. He, however, waived performance by Barney at that time. He never repudiated his liability to Barney as holder of the legal title in trust for him as to a one-half interest, and therefore the plea of the statute of limitations is of no avail.

[2] It is further contended by the learned counsel for the respondents that the appellants have lost this right by laches. There is no basis for this contention. Their rights were recognized by the semi-annual and annual statements down to 1906, and were never questioned until shortly before Barney's death in 1907, and this action was commenced June 25, 1909. The theory that said statements were in-

tended merely to advise Barney what it would cost him to purchase an undivided half of the premises, should he desire to do so, cannot be accepted.

It is further contended that the case was tried on the theory that Barney's only interest in the purchase was under the agreement of May 8, 1890, and that the plaintiffs should not be permitted to succeed on the appeal on a different theory. An examination of the record fails to show that the case was not tried, on the part of the plaintiffs, on the same theory as that upon which it has been presented upon the appeal, viz., that the premises were purchased on joint account, and that the agreement of May 8th merely reduced to writing Hoyt's obligation, theretofore resting in parol, to advance the purchase price and carrying charges for a time.

[3] Upon the trial, a formal stipulation in writing was introduced in evidence waiving all questions with respect to any defect in or misjoinder of parties plaintiff or defendant, and with a view to shortening the trial by avoiding an accounting, stipulating the amount of the recovery to which the plaintiffs would be entitled in the event of a recovery. It is not entirely clear, however, that it was intended by the stipulation to confer power upon the appellate court to grant final judgment; and since we cannot, without the consent of the parties, reverse findings of fact on material questions and direct final judgment, the judgment must be reversed and a new trial granted with costs to appellants to abide the event, unless counsel shall stipulate on the settlement of the order that final judgment may be entered by this court on the basis of said stipulation. All concur.